# Illinois Official Reports

## Supreme Court

***People v. Bonilla*, 2018 IL 122484**

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DERRICK BONILLA, Appellee. |
| Docket No. | 122484 |
| Filed | October 18, 2018 |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of Rock Island County, the Hon. Frank R. Fuhr, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and John L. McGehee, State's Attorney, of Rock Island (David L. Franklin, Solicitor General, Michael M. Glick and Eldad Z. Malamuth, Assistant Attorneys General, of Chicago, and Patrick Delfino, Lawrence M. Bauer, and Gary F. Gnidovec, of the Office of the State's Attorneys Appellate Prosecutor, of Ottawa, of counsel), for the People. |
| | Katherine M. Strohl, of Ottawa, and Hector Lareau, of Rock Island, for appellee. |

| Justices | JUSTICE KILBRIDE delivered the judgment of the court, with opinion. |
| | Justices Garman, Burke, Theis, and Neville concurred in the judgment and opinion. |
| | Chief Justice Karmeier dissented, with opinion. |
| | Justice Thomas dissented, with opinion, joined by Chief Justice Karmeier. |

**OPINION**

¶ 1     This appeal presents a search and seizure issue involving application of this court's recent opinion in *People v. Burns*, 2016 IL 118973. *Burns*, relying on *Florida v. Jardines*, 569 U.S. 1 (2013), held that the warrantless use of a drug-detection dog at a defendant's apartment door, located within a locked apartment building, violated a defendant's rights under the fourth amendment to the United States Constitution. U.S. Const., amend. IV. In this case, the circuit court of Rock Island County determined that police violated defendant's fourth amendment rights by conducting a dog sniff of the threshold of defendant's apartment, located on the third floor of an unlocked apartment building. The appellate court affirmed. 2017 IL App (3d) 160457. We now affirm.

¶ 2                                    BACKGROUND

¶ 3     The facts of this case were stipulated to by the parties.[1] Defendant, Derrick Bonilla, lived in an apartment at Pheasant Ridge Apartment Complex in Moline, Illinois. The East Moline Police Department received a tip that defendant was selling drugs from his apartment. Acting on that tip, on March 19, 2015, officers brought a trained drug-detection dog to defendant's apartment building. The exterior doors to the apartment building were not locked. The three-floor apartment building contained four apartments on each floor. Once inside the building, Moline canine officer Genisio[2] walked his drug-detection dog through the second-floor common area. The dog showed no interest in the second-floor common area and did not alert on any of the apartment thresholds. Officer Genisio then walked his dog through the third-floor common area. The dog showed no interest in units 301, 302, or 303. As the dog came to defendant's apartment, unit 304, however, it moved back and forth in the doorway, sniffed at the bottom of the door, and signaled a positive alert for the presence of

---

[1]We note that the supplemental certification of record contains an "Agreed Statement of Facts" indicating "[t]he search warrant and affidavit filed in [this] case *** is the same search warrant and affidavit that was the subject of the defendant's motion to suppress evidence. It was the same search warrant and affidavit that was viewed by the trial judge in reaching his conclusion with respect to the motion to suppress." Unfortunately, neither the common-law record nor the supplemental record contains a copy of the search warrant and affidavit. Because the trial court's factual findings are not contested by the parties, we have relied on the report of proceedings, the defendant's motion to quash warrant and suppress evidence, and the parties' briefs in setting forth the relevant facts of this case.

[2]The record on appeal does not indicate Officer Genisio's first name.

narcotics. Officers obtained a search warrant for defendant's apartment based on the drug-detection dog's alert. Officers searched defendant's apartment and found cannabis. Defendant was later arrested and charged with unlawful possession of cannabis with intent to deliver (720 ILCS 550/5(c) (West 2014)).

¶ 4      In June 2015, defendant filed a motion to suppress. A hearing was held on that motion in August 2016. The parties stipulated to the facts, and no additional testimony or evidence was presented. At the conclusion of the hearing, the trial court granted defendant's motion to suppress, stating:

> "But I think whether you are doing it as a privacy interest under [*Kyllo v. United States*, 533 U.S. 27 (2001),] or a curtilage property interest under [*Jardines*, 569 U.S. 1], I think it would just be unfair to say you can't come up on a person who lives in a single family residence and sniff his door but you can go into someone's hallway and sniff their door if they happen to live in an apartment. That's a distinction with an unfair difference. So I'm granting the motion."

¶ 5      After the State's oral motion to reconsider was denied, the State appealed. The State did not file a separate certificate of impairment but did set forth in its notice of appeal that the granting of defendant's motion to suppress had the substantive effect of dismissing the charges.

¶ 6      The appellate court affirmed, holding that the common area just outside the door of an apartment constituted curtilage under *Jardines* and *Burns*. 2017 IL App (3d) 160457, ¶ 18. The appellate court determined that the State acquired the evidence of drugs by intruding into a constitutionally protected area. 2017 IL App (3d) 160457, ¶ 21. The appellate court also rejected the State's argument that the good faith exception applies to prevent the evidence from being suppressed. 2017 IL App (3d) 160457, ¶ 24. Justice Wright dissented, arguing that this court had emphasized that police entered a locked apartment complex in *Burns* and that she would hold the hallway in this unsecured apartment building was not curtilage. 2017 IL App (3d) 160457, ¶¶ 28-40 (Wright, J., dissenting). We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Jan. 1, 2015).

¶ 7                             ANALYSIS

¶ 8      The State appeals from the judgment of the appellate court affirming the trial court's order granting defendant's motion to suppress. On appeal, we give great deference to a trial court's findings of fact when ruling on a motion to suppress. *People v. Cregan*, 2014 IL 113600, ¶ 22. We will reverse the trial court's findings of fact only if they are against the manifest weight of the evidence. *Cregan*, 2014 IL 113600, ¶ 22. The trial court's legal ruling on whether the evidence should be suppressed is reviewed *de novo*. *People v. Bridgewater*, 235 Ill. 2d 85, 92-93 (2009).

¶ 9      Here, the parties stipulated to the facts. The record on appeal does not contain the search warrant and affidavit relied on by the trial court in ruling on defendant's motion to suppress. The State, as the appellant, has the burden of presenting a record sufficient to support its claim of error, and any insufficiencies must be resolved against it. *People v. Hunt*, 234 Ill. 2d 49, 58 (2009). Obviously, our legal analysis on a motion to suppress is heavily dependent on the specific facts of each case, and we admonish the State for not providing this court with a complete record in this appeal. Here, there was no testimony at the hearing on defendant's

motion to suppress. The only evidence to support issuance of the search warrant was the search warrant itself and the affidavit. It is inconceivable that the State would expect this court to review the propriety of the trial court's ruling on defendant's motion to suppress evidence without providing a copy of the documents that were considered by the trial court in making its ruling. Accordingly, any doubts that may arise from the incompleteness of the record will be resolved against the State, as the appellant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 10 The question of law at issue in this appeal is whether the warrantless use of a drug-detection dog at the threshold of an apartment door, located on the third floor of an unlocked apartment building containing four apartments on each floor, violated defendant's fourth amendment rights. We review this question of law *de novo*. *People v. Caballes*, 221 Ill. 2d 282, 289 (2006).

¶ 11                  I. Whether Defendant's Fourth Amendment Rights Were Violated

¶ 12 The State argues that use of the drug-detection dog did not violate defendant's fourth amendment rights because the common-area hallway in front of defendant's apartment door did not constitute curtilage. Defendant counters that use of the drug-detection dog at the threshold of his apartment door violated the fourth amendment to the United States Constitution (U.S. Const., amend. IV). According to defendant, "a citizen's home is first among equals in Fourth Amendment jurisprudence, and the threshold is part of the home as a matter of law."

¶ 13 The fourth amendment to the United States Constitution provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

¶ 14 The parties disagree whether this court's recent decision in *Burns* and the United States Supreme Court's decision in *Jardines* control. We begin by reviewing the Supreme Court's decision in *Jardines*. In *Jardines*, police received an "unverified tip" that marijuana was being grown in the defendant's home. *Jardines*, 569 U.S. at 3. Police subsequently went to defendant's home with a drug-detection dog and approached the front porch. After sniffing the base of the front door, the dog gave a positive alert for narcotics. Police applied for and received a warrant to search defendant's residence based on the dog sniff. A search of the residence resulted in the discovery of marijuana plants. *Jardines*, 569 U.S. at 3-4.

¶ 15 The Supreme Court limited its review "to the question of whether the officers' behavior was a search within the meaning of the Fourth Amendment." *Jardines*, 569 U.S. at 5. The Supreme Court held that a warrantless "dog sniff" of an individual's front porch was a search for purposes of the fourth amendment and suppressed the recovered evidence. The Supreme Court stated that the fourth amendment establishes

> "a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the

Fourth Amendment' has 'undoubtedly occurred.' " *Jardines*, 569 U.S. at 5 (quoting *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012)).

¶ 16     The Court in *Jardines* recognized that its decision in *Katz v. United States*, 389 U.S. 347 (1967), holding that property rights are not the sole measure of the fourth amendment's protections, may add to this baseline but does not subtract anything from the fourth amendment's protections " 'when the Government *does* engage in [a] physical intrusion of a constitutionally protected area.' " (Emphasis in original.) *Jardines*, 569 U.S. at 5 (quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring in the judgment, joined by Marshall, J.)). The Supreme Court emphasized that the principle in such a case is straightforward:

> "The officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner." *Jardines*, 569 U.S. at 5-6.

¶ 17     The Supreme Court first considered whether police intruded upon a constitutionally protected area. "The Fourth Amendment does not *** prevent all investigations conducted on private property ***." *Jardines*, 569 U.S. at 6. However, the Court expressly stated:

> "But when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Jardines*, 569 U.S. at 6 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

¶ 18     The Court specifically regarded "the area 'immediately surrounding and associated with the home'—what our cases call the curtilage" as " 'part of the home itself for Fourth Amendment purposes.' " *Jardines*, 569 U.S. at 6 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). The Court reasoned that "[t]his area around the home is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.' " *Jardines*, 569 U.S. at 7 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). The Court found "no doubt" that the police officers entered the curtilage of Jardines's home, as "[t]he front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.' " *Jardines*, 569 U.S. at 7 (quoting *Oliver*, 466 U.S. at 182 n.12).

¶ 19     After determining that police officers intruded upon a constitutionally protected area, the Supreme Court then considered whether the police conduct in entering this constitutionally protected area with a drug-detection dog was "accomplished through an unlicensed physical intrusion." *Jardines*, 569 U.S. at 7. The Court recognized that law enforcement officers need not " 'shield their eyes' when passing by the home 'on public thoroughfares,' " but an officer's ability to gather information is "sharply circumscribed" after stepping off the public thoroughfare. *Jardines*, 569 U.S. at 7 (quoting *Ciraolo*, 476 U.S. at 213). The Court also recognized an implicit license for individuals, including police, "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8.

¶ 20     "Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " *Jardines*, 569 U.S. at

8 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011). There is no customary invitation, however, for police to introduce "a trained police dog to explore the area around the home in hopes of discovering incriminating evidence." *Jardines*, 569 U.S. at 9.

¶ 21 The Court noted that it was unnecessary to decide whether the officers' investigation violated Jardines's reasonable expectation of privacy under *Katz*. The Court explained:

"The *Katz* reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." (Emphases in original.) *Jardines*, 569 U.S. at 11 (quoting *Jones*, 565 U.S. at 409).

Nor did the Court find it necessary to consider whether *Kyllo*, 533 U.S. 27, applied because "when the government uses a physical intrusion to explore details of the home (including its curtilage), the antiquity of the tools that they bring along is irrelevant." *Jardines*, 569 U.S. at 11. The Supreme Court concluded that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." *Jardines*, 569 U.S. at 11-12.

¶ 22 This court later applied the holding of *Jardines* in the context of an apartment building in *Burns*, 2016 IL 118973. In *Burns*, we held that the warrantless use of a drug-detection dog at a defendant's apartment door, located within a locked apartment building in the middle of the night, violated a defendant's rights under the fourth amendment to the United States Constitution. *Burns*, 2016 IL 118973, ¶ 81. In reaching that conclusion, we emphasized that the apartment building where the defendant lived was locked and the common areas of the building were not open to the general public. *Burns*, 2016 IL 118973, ¶ 41.

¶ 23 The State argues that this case is distinguishable from *Burns* because, here, the officers conducted a dog sniff in the *unlocked* common-area hallway outside of defendant's apartment door and the landing was not part of the defendant's curtilage under the "property-based" analysis announced in *Jardines*. According to the State, under *Burns*, an unlocked apartment common area is not curtilage. Defendant counters that, under *Burns* and *Jardines*, the threshold of defendant's apartment is constitutionally protected curtilage.

¶ 24 Here, if the area at the threshold to the door of defendant's apartment falls within the curtilage of the home, then the officer's act of approaching defendant's apartment door to have the narcotics-detection dog sniff the threshold of the apartment would constitute an unlicensed physical intrusion on a constitutionally protected area. Accordingly, this court must determine whether the threshold of the door to defendant's apartment falls within the curtilage of the home.

¶ 25 The facts of this case are nearly identical to those in *Burns*, other than the unlocked status of the apartment building. Nevertheless, we conclude that this distinction does not create a difference. The common-area hallway immediately outside of defendant's apartment door is curtilage. See *Burns*, 2016 IL 118973, ¶ 97 (Garman, J., specially concurring) ("The fact that defendant lived within a locked apartment building is helpful to her argument that her front door and landing were curtilage, but not dispositive."). Moreover, the dog sniff of the threshold of defendant's apartment is similar to the dog sniff of the door on the front porch in *Jardines*. See *Burns*, 2016 IL 118973, ¶¶ 96-97 (Garman, J., specially concurring) ("In every

relevant sense, defendant's front door and landing appear indistinct from Jardines's front door and porch.").

¶ 26     As the appellate court acknowledged in this case, "the fourth amendment does not differentiate as to type of home involved." 2017 IL App (3d) 160457, ¶ 18. We agree with the trial court that "it would just be unfair to say you can't come up on a person who lives in a single family residence and sniff his door but you can go into someone's hallway and sniff their door if they happen to live in an apartment. That's a distinction with an unfair difference." See also *Bonilla*, 2017 IL App (3d) 160457, ¶ 18 ("As the trial court noted, to reach the opposite conclusion would be to draw a distinction with an unfair difference."); *United States v. Whitaker*, 820 F.3d 849, 854 (7th Cir. 2016) (recognizing that to distinguish *Jardines* based upon the differences between the front porch of a single family home and the closed hallway of an apartment building would be to draw an arbitrary line that would apportion fourth amendment protections on vagaries of the circumstances that decide home ownership or rental property).

¶ 27     We conclude that the threshold of the door to defendant's apartment falls within the curtilage of the home. "Were this court to hold that an apartment uniformly lacks fourth amendment curtilage, we would additionally hold that those who live in apartments have less property-based fourth amendment protection *within* their homes than those who live in detached housing." (Emphasis in original.) *Burns*, 2016 IL 118973, ¶ 96 (Garman, J., specially concurring). Further, the officer's conduct of using a trained narcotics-detection dog at the threshold of defendant's apartment for the purpose of detecting contraband inside defendant's home is the precise activity the Supreme Court condemned in *Jardines*. See *Jardines*, 569 U.S. at 11-12 ("The government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment.").

¶ 28     A recent United States Supreme Court decision supports our decision in this case. The Supreme Court recently reiterated its strong tradition of protection from warrantless searches upon a person's home or its curtilage in *Collins v. Virginia*, 584 U.S. ___, 138 S. Ct. 1663 (2018):

> "[T]he Fourth Amendment's protection of curtilage has long been black letter law. '[W]hen it comes to the Fourth amendment, the home is first among equals.' *Florida v. Jardines*, 569 U. S. 1, 6 (2013). 'At the amendment's "very core" stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." ' *Ibid.* (quoting *Silverman v. United States*, 365 U. S. 505, 511 (1961)). To give full practical effect to that right, the Court considers curtilage—'the area "immediately surrounding and associated with the home" '—to be ' "part of the home itself for Fourth Amendment purposes." ' *Jardines*, 569 U. S., at 6 (quoting *Oliver v. United States*, 466 U. S. 170, 180 (1984)). 'The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened.' *California v. Ciraolo*, 476 U.S. 207, 212-213 (1986)." *Collins*, 584 U.S. at ___, 138 S. Ct. at 1670.

¶ 29     "When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred. *Jardines*, 569 U. S., at

11. Such conduct thus is presumptively unreasonable absent a warrant." *Collins*, 584 U.S. at ___, 138 S. Ct. at 1670.

¶ 30    In *Collins*, an officer walked up a driveway from the road, past the front lawn and the front perimeter of a house, and into a partially enclosed portion of the driveway abutting the house to get to the covered motorcycle he wanted to search. In deciding whether the part of the driveway where the defendant's motorcycle was parked and subsequently searched is curtilage, the Supreme Court indicated that the concept defining curtilage is " ' "easily understood from our daily experience." ' " *Collins*, 584 U.S. at ___, 138 S. Ct. at 1671 (quoting *Jardines*, 569 U.S. at 7, quoting *Oliver*, 466 U.S. at 182 n.12). The Supreme Court determined that the area was curtilage, reasoning:

> "Just like the front porch, side garden, or area 'outside the front window,' *Jardines*, 569 U. S., at 6, the driveway enclosure where [the officer] searched the motorcycle constitutes 'an area adjacent to the home and "to which the activity of the home life extends," ' and so is properly considered curtilage. *Id.*, at 7 (quoting *Oliver*, 466 U. S., at 182, n. 12.)" *Collins*, 584 U.S. at ___, 138 S. Ct. at 1671.

Accordingly, the Supreme Court concluded that, by physically intruding on the curtilage of the defendant's home to search the motorcycle, the police invaded the defendant's fourth amendment interest in the item searched and also invaded his fourth amendment interest in the curtilage of his home. *Collins*, 584 U.S. at ___, 138 S. Ct. at 1671.

¶ 31    The Supreme Court then declined to extend the automobile exception to permit a warrantless intrusion on a home or its curtilage. *Collins*, 584 U.S. at ___, 138 S. Ct. at 1675. In doing so, the Supreme Court specifically refused to create any exception to the general rule that curtilage receives fourth amendment protection. *Collins*, 584 U.S. at ___, 138 S. Ct. at 1675. The Court recognized that exceptions to the general rule that result in certain types of curtilage receiving fourth amendment protection for some purposes but not for others would likely create confusion. *Collins*, 584 U.S. at ___, 138 S. Ct. at 1675. The Court thus rejected the State's suggestion that it adopt a more limited rule and hold that the automobile exception does not permit warrantless entry into " 'the physical threshold of a house or a similar fixed, enclosed structure inside the curtilage like a garage.' " *Collins*, 584 U.S. at ___, 138 S. Ct. at 1674. The Court explained that such a rule "automatically would grant constitutional rights to those persons with the financial means to afford residences with garages in which to store their vehicles, but deprive those persons without such resources of any individualized consideration as to whether the areas in which they store their vehicles qualify as curtilage." *Collins*, 584 U.S. at ___, 138 S. Ct. at 1675.

¶ 32    Applying the relevant legal principles articulated by the Supreme Court in *Jardines* and *Collins* to this case yields the same result. "Just like the front porch, side garden, or area 'outside the front window,' " the threshold of defendant's apartment door constitutes " 'an area adjacent to the home and "to which the activity of home life extends" ' and so is properly considered curtilage." *Collins*, 584 U.S. at ___, 138 S. Ct. at 1671 (quoting *Jardines*, 569 U.S. at 6-7, quoting *Oliver*, 466 U.S. at 182 n.12). Accordingly, we hold that in physically intruding on the curtilage of defendant's apartment to conduct a dog sniff of the threshold, officers violated defendant's fourth amendment rights.

¶ 33         II. Whether the Good-Faith Exception to the Exclusionary Rule Applies

¶ 34        Alternatively, the State asserts that, even if the police violated the fourth amendment in this case, the evidence should not be suppressed because the officers acted in good-faith reliance on established precedent. The State acknowledges that this court rejected a similar argument in *Burns*.

¶ 35        "Generally, courts will not admit evidence obtained in violation of the fourth amendment." *Burns*, 2016 IL 118973, ¶ 47 (citing *People v. Sutherland*, 223 Ill. 2d 187, 227 (2006)). As this court recognized in *Burns*:

> "The fruit-of-the-poisonous-tree doctrine is an outgrowth of the exclusionary rule providing that 'the fourth amendment violation is deemed the "poisonous tree," and any evidence obtained by exploiting that violation is subject to suppression as the "fruit" of that poisonous tree.' " *Burns*, 2016 IL 118973, ¶ 47 (quoting *People v. Henderson*, 2013 IL 114040, ¶ 33).

"[T]he 'prime purpose' of the exclusionary rule 'is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.' " *Illinois v. Krull*, 480 U.S. 340, 347 (1987) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The good-faith exception to the exclusionary rule is a judicially created rule providing that evidence obtained in violation of a defendant's fourth amendment rights will not be suppressed when "police acted with an ' "objectively 'reasonable good-faith belief' that their conduct [was] lawful," ' or when their conduct involved only simple, isolated negligence." *People v. LeFlore*, 2015 IL 116799, ¶ 24 (quoting *United States v. Katzin*, 769 F.3d 163, 171 (3d Cir. 2014), quoting *Davis v. United States*, 564 U.S. 229, 238 (2011), quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)).

¶ 36        This "good-faith exception" to the exclusionary rule has been codified in section 114-12(b)(1), (b)(2) of the Code of Criminal Procedure of 1963:

> "(1) If a defendant seeks to suppress evidence because of the conduct of a peace officer in obtaining the evidence, the State may urge that the peace officer's conduct was taken in a reasonable and objective good faith belief that the conduct was proper and that the evidence discovered should not be suppressed if otherwise admissible. The court shall not suppress evidence which is otherwise admissible in a criminal proceeding if the court determines that the evidence was seized by a peace officer who acted in good faith.
>
> (2) 'Good faith' means whenever a peace officer obtains evidence:
>
>> (i) pursuant to a search or an arrest warrant obtained from a neutral and detached judge, which warrant is free from obvious defects other than non-deliberate errors in preparation and contains no material misrepresentation by any agent of the State, and the officer reasonably believed the warrant to be valid; or
>>
>> (ii) pursuant to a warrantless search incident to an arrest for violation of a statute or local ordinance which is later declared unconstitutional or otherwise invalidated." 725 ILCS 5/114-12(b)(1), (2) (West 2012).

¶ 37        The good-faith exception to the exclusionary rule includes good-faith reliance upon binding appellate precedent that specifically authorized a particular practice but was

subsequently overruled. *Davis*, 564 U.S. at 241; *People v. LeFlore*, 2015 IL 116799, ¶¶ 29-31.

¶ 38    The State argues that the good-faith exception to the exclusionary rule should apply in this case for the same reasons argued by the State in *Burns*: (1) the officers relied on binding United States Supreme Court precedent holding that dog sniffs are not fourth amendment searches; (2) the officers relied on Illinois precedent holding that residents have no reasonable expectation of privacy in apartment building common areas; and (3) the officers relied on federal precedent holding there was no reasonable expectation of privacy in apartment building common areas. According to the State, it was objectively reasonable for the officers to rely in good faith on "binding appellate precedent that the precise location of the K9 sniff was not constitutionally protected." According to the State, "that the exterior door here was unlocked makes all the difference." We disagree. As we have already stated, whether the entrance to the common area of the defendant's apartment was unlocked, as opposed to being locked, is a distinction without a difference. *Supra* ¶ 25.

¶ 39    First, in support of its contrary conclusion, the State cites *United States v. Place*, 462 U.S. 696 (1983), *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), and *Illinois v. Caballes*, 543 U.S. 405 (2005), in arguing that "for thirty years, and on three separate occasions, the United States Supreme Court has held that a K9 sniff was neither a Fourth Amendment search nor constitutionally relevant." In *Place*, the Supreme Court held that use of a drug-detection dog to sniff luggage at an airport "did not constitute a 'search' within the meaning of the Fourth Amendment." *Place*, 462 U.S. at 707. In *Edmond*, the Supreme Court held that there was no fourth amendment search when officers conducted a dog sniff of an automobile at a highway checkpoint. *Edmond*, 531 U.S. at 40. In *Caballes*, the Supreme Court held that "the use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view' [citation]—during a lawful traffic stop generally does not implicate legitimate privacy interests." *Caballes*, 543 U.S. at 409 (quoting *Place*, 462 U.S. at 707).

¶ 40    As this court explained in *Burns*, "contrary to the State's argument, United States Supreme Court precedent has long provided that the home has heightened expectations of privacy and that at the core of the fourth amendment is 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Burns*, 2016 IL 118973, ¶ 56 (quoting *Silverman*, 365 U.S. at 511). None of these Supreme Court cases cited by the State implicate this core fourth amendment right involving the home and its curtilage. Rather, *Place*, *City of Indianapolis*, and *Caballes* involved use of dog sniffs in *public places*. Here, the police conduct involved the warrantless use of a drug-detection dog *at the threshold of defendant's home*. That conduct is simply not supported by an objectively reasonable good-faith belief that it was specifically authorized under any United States Supreme Court precedent.

¶ 41    The State next argues that the good-faith exception to the exclusionary rule should apply because the officers relied on *People v. Smith*, 152 Ill. 2d 229 (1992), holding that residents had no reasonable expectations of privacy in apartment building common areas. We have already reviewed and discussed *Smith* in detail and rejected the State's argument in *Burns*. *Burns*, 2016 IL 118973, ¶ 58. Nevertheless, the State argues that officers could rely in good faith on *Smith*, regarding the lack of privacy interests in unlocked common areas. The State

contends that the fact that the common area in this case was unlocked meant that it was a place officers had a legal right to be.

¶ 42    Contrary to the State's assertion, *Smith* did not hold that tenants have no expectation of privacy in common areas of either locked or unlocked apartment buildings. Rather, as we noted in *Burns*, "*Smith* concerned an individual's reasonable expectation of privacy in things overheard by the police while standing in a common area of an unlocked apartment building." *Burns*, 2016 IL 118973, ¶ 58. Here, in contrast, conducting a search with a drug-detection dog is much different from overhearing a private conversation. Consequently, *Smith* does not support the State's position any more in this case than it did in *Burns*.

¶ 43    The State also argues that officers could rely in good faith on *People v. Carodine*, 374 Ill. App. 3d 16 (2007), to believe that the unlocked common area was not constitutionally protected. We now examine *Carodine*.

¶ 44    In *Carodine*, a surveillance officer observed a defendant remove a bag from a dryer vent protruding from the outside wall of an apartment building, remove an item from the bag, and hand the item to a person who gave money to the defendant. *Carodine*, 374 Ill. App. 3d at 18-19. A few minutes later, the officer recovered a bag from the vent that contained cocaine and heroin. *Carodine*, 374 Ill. App. 3d at 19. On appeal, the defendant argued that the trial court erred by denying his motion to suppress the narcotics retrieved by police from the dryer vent that led from the inside of his apartment to the exterior wall of the building. *Carodine*, 374 Ill. App. 3d at 21. The appellate court held that no search occurred because the defendant did not have an objective expectation of privacy in the vent that led from inside his apartment to the common-area exterior wall of the apartment building. *Carodine*, 374 Ill. App. 3d at 24. The court reasoned that "the dryer vent was located in a common area where other tenants of the building, the landlord, delivery persons, door-to-door salesmen and other members of the public had access." *Carodine*, 374 Ill. App. 3d at 24. We agree with defendant that the facts and holding in *Carodine* are insufficiently analogous to offer any value to the analysis of the case at hand. Most notably, *Carodine* involved the exterior wall of an apartment building; it did not involve a drug-dog sniff at the threshold to the door of an apartment.

¶ 45    We also agree with defendant that the Illinois case most on point at the time of the warrantless search in this case was the Fourth District Appellate Court opinion in *People v. Burns*, 2015 IL App (4th) 140006. The appellate court's holding in *Burns*, later affirmed by this court, was that the warrantless dog sniff of the common-area landing outside of an apartment door was an illegal search under the fourth amendment. The only difference between the facts in *Burns* and the facts here is that the exterior door to the apartment building in *Burns* was locked. The State does not cite any binding appellate decision, state or federal, that was available at the time of the search, specifically authorizing the warrantless use of a drug-detection dog at the threshold of an apartment door or any other home.

¶ 46    The State also cites a Seventh Circuit Court of Appeals case as binding precedent in Illinois absent contrary state authority. See *United States v. Brock*, 417 F.3d 692 (7th Cir. 2005), *abrogation recognized by United States v. Gutierrez*, 760 F.3d 750 (7th Cir. 2014). In *Brock*, officers performed a dog sniff outside the locked door of the defendant's bedroom. The Seventh Circuit Court of Appeals affirmed the denial of the defendant's motion to suppress. *Brock*, 417 F.3d at 697. The court relied on Supreme Court decisions holding that a drug-dog sniff does not constitute a search for fourth amendment purposes because it reveals

only the presence or absence of narcotics and therefore implicates no legitimate privacy interest. *Brock*, 417 F.3d at 695.

¶ 47 There are two problems with the State's reliance on *Brock*. First, critical to *Brock's* holding was that the dog sniff in the case was not a fourth amendment search because police were lawfully present inside the common areas of the residence with the consent of the defendant's roommate. *Brock*, 417 F.3d at 697. Second, *Brock* is no longer good law, and its abrogation has been recognized after the 2013 decision in *Jardines*. See *Gutierrez*, 760 F.3d at 755-56 ("*Brock* is no longer good law; *Jardines* expressly held that a drug-dog's sniff on the curtilage is a Fourth Amendment search for which a warrant is typically required."). *Jardines* was decided two years before the dog sniff in this case, and *Brock* had already been recognized as abrogated. Accordingly, the State's reliance on *Brock* is misplaced.

¶ 48 The State also cites federal cases holding that there was no reasonable expectation of privacy in apartment building common areas. *United States v Correa*, 653 F.3d 187 (3d Cir. 2011); *United States v. Scott*, 610 F.3d 1009 (8th Cir. 2010); *United States v. Dillard*, 438 F.3d 675 (6th Cir. 2006); *United States v. Miravalles*, 280 F.3d 1328 (11th Cir. 2002); *United States v. Taylor*, 248 F.3d 506 (6th Cir. 2001); *United States v. Nohara*, 3 F.3d 1239 (9th Cir. 1993); *United States v. Concepcion*, 942 F.2d 1170 (7th Cir. 1991); *United States v. Barrios-Moriera*, 872 F.2d 12 (2d Cir. 1989), *abrogated on other grounds by Horton v. California*, 496 U.S. 128, 130 (1990); *United States v. Eisler*, 567 F.2d 814 (8th Cir. 1977). The State argues that, given this legal landscape, the officers here would have had no reason to suspect that their conduct was wrongful under the circumstances. This court has already rejected the State's "legal landscape" argument in *Burns*. *Burns*, 2016 IL 118973, ¶ 67. Significantly, all of these cases were pre-*Jardines*, and many of these cases had already been called into doubt as no longer good law after *Jardines*. Indeed, *Jardines* was decided two years before the dog sniff of defendant's threshold in this case.

¶ 49 For these reasons, we hold that the good-faith exception to the exclusionary rule is not applicable.

¶ 50                                    CONCLUSION

¶ 51 We hold that the warrantless use of a drug-detection dog at the threshold of defendant's apartment door violated his rights under the fourth amendment to the United States Constitution. U.S. Const., amend. IV. We also conclude that the good-faith exception to the exclusionary rule does not apply. We affirm the judgment of the appellate court and affirm the trial court's judgment granting defendant's motion to suppress.

¶ 52 Affirmed.

¶ 53 CHIEF JUSTICE KARMEIER, dissenting:

¶ 54 I join in Justice Thomas's dissent—as I did in *People v. Burns*, 2016 IL 118973—and I write separately only to add a few observations of my own and reiterate some points he made in *Burns*.[3] Early on, the majority recognizes that "our legal analysis on a motion to suppress is heavily dependent on the specific facts of each case" (*supra* ¶ 9); however, the majority

---

[3]See *Burns*, 2016 IL 118973, ¶¶ 103, 113, 121, 125 (Thomas, J., dissenting, joined by Karmeier, J.)

then readily takes statements the Supreme Court made in the context of true "curtilage" cases and plugs them into an analysis of a much different property interest, purporting to distinguish this court's opinion in *People v. Smith*, 152 Ill. 2d 229 (1992). In that regard, the majority employs a suspiciously evolving distinction of *Smith*, which addressed reasonable expectations of privacy in similar circumstances but reached a different result. However, even if we were to assume that *Smith* is no longer good law after *Jardines*—as the majority suggests—it is to me inconceivable that the majority can say *Smith* is irrelevant—along with all the other cases cited by Justice Thomas in *Burns*—for purposes of applying the good-faith exception to the exclusionary rule.

¶ 55    First, I do not believe that the majority's analytical overlay of the Supreme Court's decision in *Collins v. Virginia*, 584 U.S. ___, 138 S. Ct. 1663 (2018), adds anything to the majority's recycled analysis from *Burns*. *Collins* does not advance the majority's cause. Though I understand the majority's desire to impose some form of residential egalitarianism in this context, precedent simply does not support it—at least not the Supreme Court's property-based dispositions in *Jardines* and *Collins*. There are very real differences in the facts, the reasonable expectations of privacy, and the property interests involved. *Collins* is still a traditional curtilage case, like *Jardines*. In *Collins*, the police deviated from the public thoroughfare and went *through* the close of defendant's private property and onto his driveway, to search a motorcycle located in what was characterized as a "driveway enclosure," an area that the Supreme Court described as adjacent to the home, " ' "to which the activity of the home life extends." ' " *Collins*, 584 U.S. at ___, 138 S. Ct. at 1671 (quoting *People v. Jardines*, 569 U.S. 1, 7 (2013), quoting *Oliver v. United States*, 466 U.S. 170, 182 n.12 (1984)).

¶ 56    In reaching its result in this case, the majority alternately claims that "[t]he common-area hallway immediately outside of defendant's apartment door is curtilage" and "the threshold of defendant's apartment door constitutes ' "an area adjacent to the home and '*to which the activity of home life extends*' " and so is properly considered curtilage.' " (Emphasis added.) *Supra* ¶¶ 25, 32 (quoting *Collins*, 584 U.S. at ___, 138 S. Ct. at 1671, quoting *Jardines*, 569 U.S. at 6-7, quoting *Oliver*, 466 U.S. at 182 n.12). The absurdity of the majority's claim is highlighted by the dissenting appellate justice in this case:

> "No portion of the third-floor hallway is enclosed. Defendant was not using the area outside his doorway for any private purpose such as for a sitting or reception area for himself or his guests. Nothing other than the thickness of defendant's locked apartment door separated defendant's private area from the publicly-accessible hallway. Defendant did not position any item to cause the general public to detour around the threshold of his locked door. Lastly, and importantly, defendant took no steps to protect the exterior of his apartment door from the view or observations of people lawfully travelling back and forth throughout the unlocked apartment building." 2017 IL App (3d) 160457, ¶ 36 (Wright, J., dissenting).

¶ 57    The majority likens the common hallway of this unlocked apartment building to the private porch of *Jardines* and the private driveway of *Collins*, both of which were *within* the perimeter, or close, of the residential property those defendants actually occupied.[4] This

---

[4]The Supreme Court, in *Jardines*, made clear that it was intrusion *onto* Jardines's property that formed the basis for the Court's decision: "[W]e need not decide whether the officers' investigation of

defendant had no such interest in the common hallway of the multistory apartment building in which he was one of many tenants. It was not *his* property. He did not own the hallway, or have an exclusive right of control, nor any semblance of habitation there. Certainly, his family life did not extend there.[5] Would we envision family dinners in the hallway? Gardening? Recreation? Perhaps drinks with friends? Of course not. What aspects of family life are we talking about? Clearly, the hallway is *not* "an area adjacent to the home *** to which the activity of home life extends." When we employ the property-based approach of *Jardines* and *Collins*—as opposed to a privacy-based analysis—we have to live with the strictures of the former; we have to accept the limitations of the property right at issue.

¶ 58    The hallway is simply a publicly accessible means of ingress or egress for defendant, all the other residents, and anyone else who cares to come or go through the building's unlocked doors. The owner of the building evinced no intent to prohibit anyone from entering. The exterior doors leading into the apartment building's common-area hallways were not locked, and there was no lock, passcard, entry system, or anything whatsoever on the closed exterior doors of the apartment building that would prevent any person off the street from entering into the common-area hallways of the building. Officer Genisio walked through those publicly accessible, common hallways. He was where he had a right to be. He never invaded defendant's living space, nor did he encroach upon property we would recognize as defendant's, owned or leased. In short, he did not violate defendant's "curtilage," the dimensions of which the majority would be hard-pressed to fully define. Is this "threshold-curtilage" a matter of inches in front of defendant's apartment door? Is that "an area adjacent to the home *** to which the activity of home life extends?" If more, how far does it extend? Do other residents traverse and violate defendant's curtilage when they pass his apartment door while going about their daily activities? Does this "curtilage" include the entirety of the third-floor hallway? Perhaps it encompasses all the hallways of the unlocked apartment building. Who knows?

¶ 59    If "[t]he common-area hallway immediately outside of [a] defendant's apartment door *is* curtilage," (emphasis added) as the majority at one point states, then the officers in *Smith* were clearly in it when they sought to overhear a conversation in that defendant's apartment. However, in that case, this court held "no fourth amendment 'search' can be said to have occurred because defendant did not have a reasonable expectation of privacy in his conversation."[6] *Smith*, 152 Ill. 2d at 245. Among the factors this court found pertinent to its

---

Jardines' home violated his expectation of privacy under *Katz*. One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred." *Jardines*, 569 U.S. at 11.

[5]In short, there was no " 'physical intrusion of a constitutionally protected area' " as required by the Supreme Court in *Jardines*. See *Jardines*, 569 U.S. at 5 (quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring in the judgment, joined by Marshall, J.)).

[6]The court cited, with implied approval, this court's decision in *People v. Wright*, 41 Ill. 2d 170 (1968), where the court upheld admission of evidence developed by means of an officer's eavesdropping into a private residence through an open window. The officer watched and listened through a rear window of an apartment from a Chicago Transit Authority right-of-way only one to three feet from the building.

pronouncement on defendant's expectations of privacy, the court listed the following: (1) the area where the officers overheard defendant's conversation was a common area—and the court cited authority holding that *expectations of privacy are diminished in the common areas of an apartment building*; (2) "*the area where the officers were standing when they overheard the conversation was unlocked*"; (3) defendant's voice was raised; and (4) "the officers used no artificial means to enhance their ability to hear defendant's conversation, *nor did they enter an area where they had no legal right to be*." (Emphases added.) *Smith*, 152 Ill. 2d at 246.

¶ 60     As I read *Smith*, the fact that the officers were in the common area of an "unlocked" apartment building *mattered*. The *Burns* majority also appeared to think that was a distinction supporting the decision in that case: "Contrary to the State's assertion, *Smith* did not hold that tenants have no expectation of privacy in common areas of *locked* apartment buildings. Rather, *Smith* concerned an individual's reasonable expectation of privacy in things overheard by the police while standing in a common area of an *unlocked* apartment building. Consequently, *Smith* does not support the State's position." (Emphases added.) *Burns*, 2016 IL 118973, ¶ 58. In its analysis, the *Burns* majority referred to the "locked" door of the apartment building multiple times. It was clearly an essential part of the disposition. Now, the majority's distinction of *Smith* appears to be evolving as the need arises, as can be seen in the majority's statement in *this* case: "Contrary to the State's assertion, *Smith* did not hold that tenants have no expectation of privacy in common areas of either *locked or unlocked* apartment buildings." (Emphasis added.) *Supra* ¶ 42.

¶ 61     This court's decision in *Smith*, considered in conjunction with the principles the Supreme Court espoused in *Illinois v. Caballes*, 543 U.S. 405 (2005), would appear to validate the officer's activities in this case. In *Caballes*, the Supreme Court stated:

> "Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment. [*United States v. Jacobsen*, 466 U.S. 109, 123 (1984)]. We have held that any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.' *Ibid.* This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest *** in 'privacy that society is prepared to consider reasonable.' *Id.*, at 122 (punctuation omitted). In *United States v. Place*, 462 U. S. 696 (1983), we treated a canine sniff by a well-trained narcotics-detection dog as '*sui generis*' because it 'discloses only the presence or absence of narcotics, a contraband item.' *Id.*, at 707; [citation]." (Emphasis in original.) *Caballes*, 543 U.S. at 408-09.

While one might argue those statements were intended to apply only to traffic stops, the Court's need to distinguish its decision in *Kyllo v. United States*, 533 U.S. 27 (2001), which addressed, *inter alia*, the expectations of privacy in a residence, suggests otherwise. In *Kyllo*, the Court had held that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search. In *Caballes*, the Court could have distinguished *Kyllo*, principally upon the different privacy interests recognized in automobiles and homes—however, that is not the "critical" distinction the Court cited:

"Critical to that decision was the fact that the device was capable of detecting lawful activity—in that case, intimate details in a home, such as 'at what hour each night the lady of the house takes her daily sauna and bath.' *Id.*, at 38. The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Caballes*, 543 U.S. at 409-10.

The bottom line is this is *not* a curtilage case. *Smith* and *Caballes* provide the controlling authority.

¶ 62    However, for the sake of argument, let us suppose the officer *did* unwittingly violate this newly devised minicurtilage, wherever it might be. What about the good-faith exception to the exclusionary rule? If the officer did not believe the common hallway of an unlocked apartment building qualified as the "curtilage" of a specific apartment, then he would have no reason to believe that the Supreme Court's property-based decision in *Jardines* changed the settled authority of *Smith* and a number of federal decisions, which were based upon reasonable expectations of privacy and held that there *was* no such expectation in the common hallway of an unlocked apartment building. See *Burns*, 2016 IL 118973, ¶¶ 103, 113, 121, 125 (Thomas, J., dissenting, joined by Karmeier, J.) Those authorities, considered in conjunction with *Caballes*, establish that defendant had no reasonable expectation of privacy in the common hallway of an unlocked apartment building and he further had no expectation of privacy with respect to the contraband in his apartment.

¶ 63    The appellate court's decision in *Burns* (*People v. Burns*, 2015 IL App (4th) 140006) could not trump this court's decision in *Smith* and the United States Supreme Court's decision in *Caballes*. *Those* cases provided the governing principles at the time the officer acted. And we should be fair in our appraisal of the officer's conduct. As this court recognized in *People v. LeFlore*, 2015 IL 116799, ¶ 24, "exclusion [of evidence] is invoked only where police conduct is both 'sufficiently deliberate' that deterrence is effective and 'sufficiently culpable' that deterrence outweighs the cost of suppression."[7] Given the prevailing supreme court authority at the time the officer acted, his conduct does not qualify as "culpable." In the end, when the members of this court, and those of the appellate panel, cannot agree whether this area qualifies for protection as "curtilage" or warrants an expectation of privacy, can we expect police officers to appreciate such nuanced distinctions, so that they would recognize that *Jardines* changed the law in this context? We should only expect of them "good faith," not scholarly discernment.

¶ 64    For the foregoing reasons, I respectfully dissent.

¶ 65    JUSTICE THOMAS, dissenting:

¶ 66    The issue in this case is whether the police conducted an illegal search by using a drug-sniffing dog in the *unlocked* common-area hallway outside of defendant's apartment

---

[7]Noticeably absent in the majority's opinion here is the extended discussion of *LeFlore* that the majority saw fit to include in *Burns*. See *Burns*, 2016 IL 118973, ¶¶ 49-52.

door. In *People v. Burns*, 2016 IL 118973, I concluded that the police's use of a drug-sniffing dog in the *locked* common-area hallway outside of the defendant's door was perfectly legal and did not violate the fourth amendment because (1) the concept of curtilage has no application to the common areas of multiple-unit structures and (2) there is no reasonable expectation of privacy in the common areas of an apartment building. *Id.* ¶ 103 (Thomas, J., dissenting, joined by Karmeier, J.). My reasons for reaching this conclusion are set forth fully in my *Burns* dissent, and I need not repeat them here. For present purposes, it is sufficient to say that, for the very same reasons I concluded that the use of a drug-sniffing dog in a *locked* common-area hallway raises no fourth amendment concerns, I likewise conclude that the use of a drug-sniffing dog in an *unlocked* common-area hallway raises no fourth amendment concerns. Accordingly, I respectfully dissent.

¶ 67       CHIEF JUSTICE KARMEIER joins in this dissent.